The first case for argument this morning is 16-2084 Mexichem Amanco v. Honeywell. Mr. Weiss, whenever you're ready. Thank you, Your Honors. May it please the Court. This present appeal comes to the Patent Trial and Appeal Board and centers around claim construction, preferably the term asiatrope-like. This construction, which this Court reviews de novo, is not the broadest reasonable interpretation, is divorced from the specification, and is inconsistent with the claims. Well, to just cut into it, there may be any number of problems or concerns or questions with respect to this claim, but when you compare with the examiner's claim construction and the board's, why isn't the board right that adopting the examiner's construction, which I guess is one you're advocating, completely reads out the term asiatrope-like from the claim? Asiatrope-like is a term of art. It's not a set definition. It doesn't mean this close. But it means something. It means something, and you only get that from the intrinsic evidence. So? So you get it from the patent or the document or whichever, wherever it comes from, only in that. We have to look at this document itself, these patents at issue, where they define what they mean as asiatrope-like. Okay, so what definition are you advocating? My advocation is that it includes all the embodiments and all the preferred embodiments. So, for example, I'm referring to the 081 patent, where it says, and this is line 7 to 23, So what you're suggesting is that the claim should be limited to the compounds that are described there without regard to whether they have asiotrope-like qualities? Yes. Wait a second. And that those combinations of compounds, perhaps with one exception, were disclosed in Inagaki. Is that correct? No, I am not saying that. I am saying that the inventor stated that these compounds in these ranges are asiatrope-like. If you look at the four specific… Wait, wait, wait. Aren't you contending that the compounds that are disclosed in these three claims, that are representative claims, were disclosed in Inagaki? That is correct. Okay, so your argument is that the claims ought to be confined to the compounds that are disclosed there, right? Correct. Without regard to whether they're asiotrope-like or not, correct? The reason, no.  No, because asiotrope-like, again, you have to figure out what asiotrope-like means by the patents at issue. I'm really confused. Okay. Is it not the case that the range of compounds disclosed in these three claims, that not all of them are asiotrope-like? No, it is not that case. There is no example, not one example in these patents where there is anything that would not be considered asiotrope-like. For example… I'm really confused. I think you're pushing back on Judge Dyke, and I don't know why you are, but… Is it because it's your view that based on what is disclosed in the specification, it necessarily is any mixture of the ingredients recited in the claims results in an asiotrope-like composition? According to the patents at issue. Right. So when Judge Dyke asks you, you know, it's restricted to just asiotrope-like compounds, what we're having here is a definitional debate of what is actually asiotrope-like. Yes, and I'm sorry, and I guess what I was looking at where the board itself said, well, this is a broad guideline, this isn't a definition. So asiotrope-like still has to be asiotrope-like within that range. Well, are you contending that all of the compounds, the combinations disclosed in the three claims are asiotrope-like? Yes, according to what they claim in their specific examples. Let me ask it a little differently. Are you claiming that, is it your argument that any and every mixture of percentage weight of the recited ingredients in the claims can and will result in a constant or essentially constant boiling point? They will result in an essentially constant boiling point. I cannot say anything to the constant boiling point because that's different, that's an asiotrope. But the claims are not asiotrope-like. Well, are you saying that based on the broad coverage of the spec, that they've redefined asiotrope to kind of mean anything and everything, and that's why your broad construction reads on this? No, because asiotrope is known. What we're talking about is a term of our asiotrope-like. It only has context for whatever reference you have. If I have another patent. So how would you construe, you're looking at the spec, let's go back to where you started. How would you construe asiotrope-like in the claims based on the specification? I would see what they gave as the examples. So first the broad example, which is compound trans 1, 2, 3, 4, Z, E, and any ranges in combination. Then I would also look at the specific examples. I don't understand what you're saying. This is really confusing. I thought you were saying a moment ago that all the combinations of compounds disclosed in these three claims are asiotropic-like. Is that correct? Right, and I'm basing that off the spec. But what is the evidence that was before the board as to whether that is true or not? The specification, the intrinsic evidence. Were there any expert affidavits as to whether that's true or not? There were affidavits on both sides. We gave one. They gave affidavits saying that. The term, again, isn't a set term. I'm trying to answer my question. Was there any evidence before the board as to whether all of these compounds were asiotropic-like? Yes. And what was the evidence? The patents themselves, where you get the data. No, no, apart from the patents. The reason we call these asiotrope-like... Was there any evidence that all of these compounds, put aside the specification, was there any evidence that all of the compounds described in these three claims had asiotropic-like qualities? I guess I would say no, but there was no evidence to the opposite either. And I guess I'm struggling how we can have... The term has to be defined by these patents. There's no other evidence. There's evidence on the record of other patents using other terminology, other ranges for what asiotrope-like. Okay. And those don't carry over. So what's wrong with what the board did, which was look into the specification and see what it believed to be the patent owner's attempt at lexicography as to its coined term, asiotrope-like compositions, when the spec says asiotrope-like compositions are constant boiling or essentially constant boiling, and then just launch from there and then apply that definition? And I would apply that definition. They also say it must be effective amounts. Effective amounts of the various recited ingredients in the claim that result in constant boiling or essentially constant boiling. What's wrong with that? It's not. When I read the examples of what they give as effective amounts, I look at example one. It says, specifically, HFO-1234 and HFC-134a states in preferred embodiments the present intervention provides novel asiotrope-like compositions comprising trans-HFO and HFC-134a. Preferably effective amounts are from greater than zero to about 75 weight percent trans-HFO-1234-ZE and from about 25 weight percent to less than 100 weight percent HFC-134a. In example two, this is the binary between the 1234-ZE trans compound and the 1.5. They say the preferable effective amounts are from zero to about 99 weight percent trans-HFO-1234-ZE and from about one weight percent to less than 100 weight percent HFC-125. Those are all broad ranges, I grant you. But in the end, what is wrong with an understanding of the patent that says anything, any mixture within these very broad weight percentages that results in a constant boiling point or an essentially constant boiling point such that when you boil the mixture, when there's stuff evaporating from the mixture, the liquid composition doesn't change very much in its composition. What's wrong with that understanding? There's nothing wrong with that understanding, and that was our understanding. Do you understand the board to be saying that while Inegaki discloses these various combinations of compounds, that this patent is limited to those that have azeotropic-like qualities, that not all of the compounds fall into that category? So it's not anticipated and obvious because the claims are limited to a species that has particular qualities. Is that what you understand the board to have said? That's what the board said. The problem we have is there's no evidence. There's been no argument. Nothing in these patents that say anything within these ranges would not meet this definition. There's not one example of something that is non-azeotrope-like. During the argument when this first started, for example, the combinations between trans-HFO-1234-ZE and HFC-135A, Honeywell had argued, we don't mean the entire range. We only mean up to 75%. The range from zero to 75% was their argument. On these briefs, they said we don't mean the entire range. We only mean up to 50% trans-HFO-1234-ZE. Those aren't consistent. The only way they are consistent, or you rectify them, is saying what was said in here, this broad range that covers all these combinations. When you look at the broad range in these combinations, there's nothing to distinguish this from what is in Inigaki. Yes, Inigaki does not use the word azeotrope-like. But again, that's a definition that has to be based on what was disclosed here in these patents. What was disclosed? All combinations. When you look at all combinations compared to the prior art, there's nothing to distinguish it. And there's nothing here that says this range within this broader range is azeotrope-like. This within this range is not azeotrope-like. Well, isn't that more of an enablement problem than it is a matter of claim construction? I mean, you can construe a claim, and it ends up being either indefinite or non-enabled when you reach those issues. The way the board has construed the claims, the claims are now indefinite, and they are not enabled because I cannot tell which – But so what? I mean, that's not what the board's job – I mean, the board here is limited to 102 and 103. So what if they try to enforce that those arguments remain for the person against whom this is enforced? I mean, maybe you're just in the wrong place at the wrong time to make the arguments you need to make. No, because I think the board's construction was wrong. Given what I see, a person of skill and art would look at here. They would see here, they would see what they are directed to. Combinations of HFO trans-1234-ZE in combination with one of the four other compounds. This is what they intended during prosecution of the patents. Just to clarify for myself, do your arguments today stand or fall based on your proposed construction of the claim? Do you have a second argument? Well, my second argument would be that let's say even going forward with – The board's construction. The board's construction. Azeotrope-like compositions, azeotropes per se are not patentable. There has to be some criticality to what they say here that distinguishes from the prior art. There's nothing here with these ranges, particular amounts. Under that construction, they haven't identified which compounds are azeotropic-like. Correct. And even if they have, they have not said why this is distinguished from the prior art that discloses the same compounds and the same patent. These perform better. This is better. They just said we can buy these. But how does that feed into what your argument – At the end of the day, in this proceeding, your argument is obviousness. Right. Based on the prior art. So why don't you explain to us how, given the board's construction, you could fit into the theory. And as they say, finding the optimal or working range of compounds that were known in the prior art or composition that was known in the prior art is not per se patentable. If they do have these specific ranges, there's no evidence here how they perform better than the percentages outside of these ranges. How is that an obviousness analysis? Because the same compounds are disclosed in the prior art in the same reference. It's a genus species question. Correct. Okay. You almost exhausted your rebuttal. We'll restore two minutes for rebuttal while we hear from the other side.  Good morning. May it please the court. Ignoring the clear – Could I understand your position? If I understand what you're saying, it's that the combinations of compounds disclosed in these claims were disclosed in an agaki, perhaps with one exception. But that these claims are patentable because they are limited to those compounds within this range that show azeotropic-like qualities. Is that correct? I believe yes, Your Honor, the way you described it. There may be an issue about the trans component. All our compounds or all our mixtures entail the trans isomer of 1234ZE, and we contend that that entity is not disclosed in an agaki. But that wouldn't affect – or disclosure of any possible mixtures being able to form azeotrope or azeotrope-like compositions, whether you accept the trans entity that is an embodiment, too, of an agaki or not. There's no disclosure whatsoever of any compositional ranges or any mixtures actually being formed in an agaki. So what you've claimed here is a subset of what is in the prior art, and the distinguishing factor is this subset in effective amounts is azeotropic-like. How do you identify which those are other than by having a result? I mean, you've claimed a result. This is what – how is that sufficient? Well, the inventors found – there's ample evidence in the record that finding an azeotrope is not predictable. There's no formula. There's no theory. Well, that's not an answer. That's your problem, because the claims then don't define which compounds are within the scope of the claims. You can only find that out by making an investigation into an unpredictable area. I mean, if you had picked out from this genus specific compounds and said we've identified these as being azeotropic-like, and we think that that was unpredictable and those are patentable over the prior art, that wouldn't be one thing. But you're not doing that. You're saying we're claiming the whole range of compounds that have azeotropic-like qualities, which is just claiming them based on the result, as Judge Perot said. Well, I would respectfully disagree, Your Honor. We are claiming the former. We're claiming that within this broad disclosure of inagaki, where there's no guidance or suggestion at all that anything could form azeotrope or azeotrope-like compounds, we have – the inventors found a subset that under certain conditions and certain compositional ranges do form. What is that subset? How do you identify the subset other than by the result? Ordinary rules of claim construction, Your Honor. Looking at the intrinsic record here, the examples in the patent. How do we know what the subset is? You say that the identification of these compounds is unpredictable. The subset is what is described in the patent. Azeotropic-like. Trans-ZE and with 125, 134A, 152A, and 227EA. Aren't they being defined by the azeotropic-like quality? And the inventors give guidance in the examples as to if you're operating at this pressure, then you're going to find the azeotropic-like quality when you have this much trans-ZE and this much of the HFC. Let me ask it as a hypothetical. Suppose there's a genus, which is a dominant patent, and you're claiming a species within the genus. Yes. And you're claiming the species within the genus simply by describing the quality, an unpredictable quality without identifying which of the compounds have that quality. Is that patentable? That is not patentable, Your Honor, but that's not what we have here. Why is that not patentable? I'm sorry? Why is it not patentable? Under which condition of unpatentability would render that claim unpatentable? If I understood Judge Dyke's question, he was saying, if you have a mixture that's in the prior art, two compositions, and you later discover that they have a certain property, then... My understanding of his question was there's a genus of mixtures that was disclosed in the prior art. But now you've gone through the practice of mechanically mixing those disclosed ingredients, or at least a handful of them, using different weight percentages, and ultimately finding through this rote mechanical routine experimentation and all that labor that certain ranges of those mixtures result in a really nice property. And so now you claim anything in the entire genus of mixtures that has that really nice property. Is that patentable or not? I believe the way you described it, yes, Your Honor, that is patentable. Why would that be patentable if, number one, the genus was known? Number two, the goal of having that desired property was known. And three, the process of trying to figure out which things in that genus has that property is known because you're just mechanically doing the mixtures. You have a team of 100 scientists, and they're all in there, you know, responsible for a certain mixture of two ingredients, and they're using a sliding scale of different weight percentages and different pressures to figure out which combinations of those two ingredients results in the very nice property. What is it about that that is inventive? Well, the law is clear that how an inventor comes to the invention is not material in terms of whether the invention is patentable. So just because you use a technique that is known in the art to find something that is unexpected, that is still recognized to be patentable under the law, and that's what we have here. We have compounds that are in a broad genus, leaving aside the trans-ZE component, in a broad genus, and it was not expected that any combinations of these would actually yield an azeotrope. Well, that's the problem because you're saying what we're claiming is a species that exhibits particular qualities which are unpredictable, and we haven't identified, except for a couple of examples, which of those compounds within the genus are going to have those unexpected qualities. I don't understand how you can have a patent which basically says we claim all species that have unpredictable, desirable qualities within the genus. But we're not, Your Honor. We're claiming a particular combination of ZE with 125. No, but wait. Stick with the hypothetical, okay? I understand there's an argument that that's not this case, but stick with the hypothetical. How can you claim, if you're trying to claim a species over a genus, you generally have to show unpredictable qualities in the species. But what you're saying is we're not going to identify the specific compounds with a couple of exceptions. We're going to claim anything that has unpredictable, desirable qualities. How can somebody claim that? I don't believe that's what we're claiming, Your Honor. No, no, you're not answering my hypothetical. I'm sorry. I don't care whether you think that's this case or not. You can argue later on it's not this case. But under that hypothetical, how can that be patentable? If an inventor discovers that there's a mixture, a species of components from the broad genus that have an unpredictable quality, and you give information and guidance to the public as to how to make that composition, which is what we have in examples, then that is the essence of patentability. You've discovered something completely unexpected. It's an exception rather than a probability. How does the specification here define which of the species within the genus have azeotropic-like qualities? In this case, we have four examples with raw data. Well, that's examples. How does it define what the rest of them are? And then there are also dependent claims that give specific... We're dealing with the independent claims here, which are the three claims that are the subject of this appeal. All of these claims recite the key claim term of azeotrope-like. And without that term, then perhaps your hypothetical would make sense. I guess, Michael, let's just talk in terms of enablement. How does your specification enable one of the TLNR to find all the other species beyond the small handful of examples that you disclosed that have this wonderful property of azeotrope-like? Because the experiment that is being used to demonstrate this unique property in the examples is a well-known technique. It's identified in the patent. It is published in a scientific publication. Dr. Singh gives testimony in this case, evidence in this case, about the technique. What's the technique? It's the appeal meter test. And with the information that you can make an azeotrope compound in these percentages, the inventors disclose what they identify to be the unique range, and they say, we've observed a temperature depression, and you can take that data as we did and plot it. We have on page 13 in our brief, you can see the actual plot of the data, and you can see the azeotrope point there, the depression point. With that information, a person of skill in the art, it's within the skill set of a person of skill in the art to take that information from the examples and know exactly what other composition. If they want to change the pressure slightly from the pressure that's given in the example, it's within the skill set of a person of skill in the art to make that change. Do we have any findings to that effect by the board? We have evidence in the record, and the board said it relied. Is that correct, there are no findings, right? I believe there are findings, Your Honor. About that? The board found that the data in the patent did show the existence of an azeotrope. Yeah, but where does the board say what you've just been saying, that there's a technique here that's described for identifying these which can be extended beyond the examples that you have here by someone skilled in the art? Where does the board make that finding? The board does not make that finding. It makes the finding that from the evidence that was presented, which includes the declaration that I was discussing, it finds that, yes, there is sufficient evidence that the patents demonstrate the existence of an azeotrope. So implicit in that finding is the fact that a person of skill in the art would understand that there is an azeotrope. So then if that's all true, that there's this established technique for going about your business to try to find all these other interesting species that have this wonderful property, why wouldn't it be obvious to do that at the time of this invention? We knew that we wanted azeotrope-like compositions. We knew there were a bunch of these compounds out there that we would like to mix to figure out if they're azeotrope-like. We know that there's a well-known established technique to go about to figure out how and which ways different mixtures are azeotrope-like. Why isn't that an obvious invention? Because, Your Honor, not all mixtures are azeotrope-like, and, in fact, you expect them not to be. There is evidence in the record from Dr. Singh describing lots of mixtures that are zeotropic that are useful as well. So just knowing that an azeotrope-like invention would be nice to have, it does not provide you the motivation to go out and try every single possible combination of components to find. I thought you said that there was evidence that someone skilled in the art would know how to do that. And I think what Judge Chen is asking you, if that's true, if you've defined what these compounds are by saying that someone skilled in the art would know how to find them, that sounds like an obvious variant, right? But you have to make the selection first. What selection? Of which compounds to start with. Once you tell someone of skill in the art, these compounds form an azeotrope-like composition at this compositional range, at this pressure, then it's within their skill set to figure out, well, if I want to change the pressure slightly, I can change the pressure slightly and end up still practicing in that compositional range with an azeotrope-like constant boiling character. But you have to start with the compounds in the first place. There's got to be a selection to begin with of the compounds. So is it your argument that something like inagaki teaches a lot of different compounds to mix together? And it's your claim confines that really broad genus down to just a small handful. And you discovered that in this small handful of mixtures you can have something that's azeotrope-like, and so therefore it was your selection in the claims of particular starting materials that was the non-obvious choice. But then once you have that non-obvious choice in front of you, then tinkering this way, that way, and the other to get to and locate the azeotrope-like compositions, it was within the routine skill, and therefore that's why it's enabled. Yes, Your Honor, exactly. That is exactly the argument that we're making here. Okay. All right. Thank you. Oh, can I ask another question? Yes, yes. So your examples, sometimes a differential of two degrees is azeotrope-like, and then there's another example where the differential is six degrees, and so it makes it a little bit hard to know for sure what your conception really is of an essentially constant boiling point if the boiling point differential can be two degrees in one example, six degrees in another example. What is one of skill in the art supposed to know and think? Well, those are two different examples. One is with 125, I believe, and the other is with 134A. So if you're working with 125, one skill in the art would understand from the guidance in the example that the constant boiling behavior is not the same as 134A, but they would be able to, again, using the... I guess maybe a different way of asking is why don't you just go with a two-degree differential as the default understanding of what is an essentially constant boiling point? Because this patent is disclosing multiple azeotropes, if we had one azeotrope disclosure, 134A and trans-EE, then that would make sense. But here we're disclosing 152A and various other... There's four in total, HFCs. So each of them is a separate azeotrope, entity, system. I think that's what the scientists call it, a system. So within that system, the information that's provided in the examples tells one of skill in the art, well, this is the degree range, the glide range, if you will, for that system. The other system is different. It's a different embodiment of an azeotrope composition. I have one other question. The argument that you've been making just now about non-obviousness, was that argument presented to the board? The argument about the test, the millimeter test? Basically, your argument is we've identified a subset of the Inigaki compositions, which is a good deal narrower than Inigaki, and described a procedure that makes it possible to identify those that have azeotropic-like qualities, and that makes this non-obvious. I believe that is our argument, Your Honor. I know it's your argument now. I'm asking if you made that argument before. That's been our argument all along, that Inigaki is a broad teaching of 30-something HFOs plus eight HFCs, no guidance to mix any of the two. In fact, the teaching... No, no, no, I understand that, but I don't... My recollection of the record here is you don't say we narrowed it down to the subset that was worth investigating and we provided a procedure and method that someone skilled in the art would use to identify those within that subset that are azeotropic-like. Stated that way, was that argument made to the board? I believe it was, Your Honor. Can you show me where? Here. We talk about... I believe it's page 52. Let's see. On page 53, we say following the teachings... I'm sorry, what part of the joint appendix are you at? I'm in the red brief, Your Honor, page 53. That's the argument made to us. And we cite... On page 52, that's where the argument begins and we are citing to... I know we refer to one of our appeal briefs. Well, all right. I don't mean to take up a lot of time with that. Perhaps you would like us to send something in a letter to you, Your Honor, after the argument? I think that would be useful, just to cite the pages where this particular argument was made, because I don't see it here in the brief. And just speaking for myself, I did not understand, after reading these briefs twice, that that was your argument. Yes, Your Honor, we'll be happy to do that. Thank you. Thank you. Just limit yourself to precisely the question that's been asked, and maybe you can take five days, within five days, but something that really only gives citations to the record. Yes, yes. So, a couple of things. You were the inner party's re-exam requester, right? Correct. So it's your burden to prove, by preponderance of evidence, that these claims are unpatentable. That is correct. Unpatentable under Section 103. Correct. And as I understand the theory that you were advancing below, it was always about this particular conception of azeotrope-like as meaning, essentially, any combination of the ingredients recited in the claim. Correct. And also, these aren't unpredictable. This is the whole thing where this whole prosecution got off track. Azeotropes are unpredictable. Azeotrope-like compositions are not unpredictable. Well, there was evidence in the record, right? It wasn't the Singh Declaration that talked about the unpredictability? Right. That evidence was submitted to the examiners, the specialists. We took that evidence and took it to a separate independent lab. The examiners said, we see no indication of an azeotrope here. The independent testing said, we see no indication of an azeotrope here. The board did not address that. The board did not even acknowledge that. That was brought up during oral arguments, but in any of the three decisions, there is no mention that the facts below state that there is no azeotrope found in the evidence submitted by Dr. Singh. But what about their argument? They're saying, look, there was this broad range, this broad genus disclosed in Inigaki. We narrowed that down to a class of genus, species, that was likely to have azeotropic-like qualities, and we told you how to find which ones did. And therefore, that is non-obvious. What's your response to that? Because that's not what they did. The compounds were known in Inigaki. That's not what who did. That's not what the invention does. That's not what Honeywell did in this patent. The compounds were known in Inigaki. That's right, but the argument is you have to, in order to meet your burden, explain why it would have been obvious to one of skill in the art at the time the invention was made to select the particular compounds from the broad range of compounds that are described in Inigaki and then use mixtures of those to create an azeotrope-like composition. To what degree were you arguing to the PTO in this Interparty 3 exam that it would be obvious to select these particular compounds that are recited in the claims? My understanding was you didn't really make that argument. Your argument is really that any combination of the compounds from Inigaki are obvious because they're all azeotropic-like. As that term, azeotropic-like, is defined in this patent. Correct. And your point earlier when you were talking about how do you distinguish from a 6 degrees boiling point and a 2 degrees boiling point. The claims are covered for these mixtures. There's no distinguishing that says if you have this and this, then the boiling point will be different than 2 or 6. When you look at that, you go back to the specification. They intended to cover all these combinations. And they say, well, we found this narrow subset. I still have not heard anywhere where there is a narrow subset. They say effective amounts are from 0 to 99 and 1 to 100 of a second. Well, they cite the examples. Those examples. Again, in those examples, those examples, for example, with 134A, goes up to 51%. In their argument here, they say only up to 50%. Previously, they said up to 75% of the trans HFO1234ZE. And they're still calling the broad range. They're not saying we found from 0 to 10 and 15 to 19. There's nothing for me to figure out other than what they have written here. Yes, this is an example. But the examples should not read out all the other embodiments in the specification. The specifications particularly say broad ranges. There's no way to say that. And there is nothing in there that says, with the exception of this. If I am reading this with skill in the art, what I see is they say that these combinations mix, they work well, and they cover all ranges. That doesn't distinguish anything from Inagaki, which says we found these combinations, they work well, and there's no suggestion in Inagaki of limitation of ranges either. And the only difference is they now call these same combinations azeotrope-like. All right. Thank you. We thank both sides. The case is submitted.